1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RAYMOND MARTIN,                         No.  2:11-cv-0870 LKK GGH (HC)

12              Petitioner,

13      v.                                    FINDINGS AND RECOMMENDATIONS

14   KATHLEEN ALLISON,

15              Respondent.

16

17

18   _Introduction and Summary_

19        Petitioner, Raymond Martin, was convicted of first degree, special circumstance, felony

20   murder, and was sentenced for that crime to life imprisonment without the possibility of parole.

21   He was also convicted of the subsidiary burglary and robbery charges (for which he received

22   stayed sentences), an assault for which he received an additional nine years, and finally, an

23   additional one year for being a principal armed with a firearm.

24        Several significant issues are raised, and one less significant:

25   1.   Due process was violated when the trial court permitted into evidence a hearsay statement

26        which was conceded to be untrustworthy in part, and which the prosecutor knew to be

27        incorrect/untrustworthy (Napue claim as to the latter assertion);

28

1

2.  The alleged error in ground 1 constituted a denial of Sixth Amendment confrontation rights (Bruton error);

3.  Due process was violated when the police tainted a witness by disclosing to her that petitioner made a threat on her life;

4.  The trial court committed error by precluding key defense evidence at a pretrial Miranda hearing;

5.  The trial court committed error by not having the jury instructed regarding involuntary manslaughter.

*Factual Background*

For purposes of general background, the parties, although vigorously contesting the admission of certain evidence, do not dispute that the evidence recounted by the Court of Appeal was correctly set forth.[1]

> The victim, Doug Cline, and his roommate Jeff Alexander shared a duplex. Cline worked in construction, but also sold small amounts of methamphetamine to his friends. Among Cline's friends were Travis Harris, who was Gregory's "street father" (i.e., not Gregory's biological father, although he treated Gregory as such), and Christopher Robison, Gregory's "street uncle."
>
> On December 26, 2005, Cline, Gregory, and Harris were at Cline's house in the bedroom, and Cline and Harris were playing video games. Cline told Gregory that he did not want Gregory bringing Martin to his house. Before long, Cline and Gregory were fighting, and Cline ended up with a red eye. Harris took Gregory out of the room, and Gregory left the house.
>
> The next day, December 27, 2005, Gregory and Mason showed up at Cline's house around 8:00 or 8:30 p.m. Gregory was wearing a 49er jacket. Gregory told Cline he wanted his money back for some bad dope. Cline told Gregory to have Harris bring back the dope. Harris testified that Gregory said that he got into an argument with Cline, and that Cline would not let him in the house. Gregory reported that Cline had told him, "FU, you're burnt," and shut the door in Gregory's face. Gregory was mad.

/////

---

[1]   Defendants at trial were petitioner, Vincent Gregory, and Stanley Mason.

2

A little later that night, Nicole Fernandez, Gregory's girlfriend, heard Gregory and Mason talking. They were talking about collecting $200 from someone that had ripped them off. Fernandez figured out that they were talking about Cline, and that they planned to rob him. Gregory, Mason, and Fernandez were at the apartment of Ericka Reed with Robison and Jessica Marsh. They did some methamphetamine, and Gregory and Mason left.

At 12:45 a.m. on December 28, Gregory called Martin. Martin did not want to talk to Gregory, but Gregory persisted, calling repeatedly until around 1:00 a.m. Finally, Harris called Martin around 1:15 a.m., and Martin took the call. After Martin talked to Harris, Gregory called Martin again, and Martin took the call. Immediately afterward, Martin had his girlfriend, Danielle Davison, give him a ride to an apartment that belonged to Martin's friend, Lisa Lindeman. Lindeman's daughter, Amanda Miller, and Amanda's boyfriend were living at the apartment. Also at Lindeman's apartment were Gregory and Mason. Gregory had a black commemorative handgun. Gregory was showing off his gun, saying, "Look what I have." Davison told police that while they were at Lindeman's house, she overheard a plan to rob Cline. Gregory asked Miller if she had any pantyhose that he could put over his face.

Martin and Davison left the apartment around 5:00 a.m. Gregory and Mason left around the same time. Gregory was driving his girlfriend's car with Mason as a passenger. Martin drove another vehicle, and Davison followed in her car. Davison understood they were going to Harris's house.

Along the way, Martin drove his vehicle (which belonged to Lindeman) into Davison's car and another car. The three vehicles carrying defendants and Davison left the scene of the accident without stopping and parked on a side street, where they emptied the contents of the car Martin had been driving into Davison's vehicle. Martin proceeded on in Davison's car with Davison driving. Gregory called Martin on Davison's cell phone and said he had decided not to go to Harris's, but instead to go rob Cline, and Martin agreed. Around 5:30 a.m. Davison let Martin out of her car, and he climbed into the car with Gregory and Mason. Before leaving Davison's car, Martin grabbed a long dark coat with a fur collar.

Martin, Gregory, and Mason went to Cline's house. Martin and Gregory went into Cline's bedroom and found Cline and Anna McDonald asleep on Cline's bed. Gregory tied Cline's hands with zip ties. They took Cline's money from his wallet and some dope from the bathroom.

/////

3

McDonald woke up to a man standing over her and pointing a gun at her. He was wearing a black ski mask with a white bandana tied around it, a baseball cap, and a 49er jacket. The other person had on a dark blue parka with fur around the hood and a light blue ski mask. Cline's hands were tied up in front of him with plastic zip ties, and he was awake.

There was a third intruder at the door of the bedroom. He was wearing a black mask. Cline said to the person holding the gun, "Why are you doing this, Vince [?]" Cline asked this over and over, saying, "Vince, why are you doing this? I have kids. I have a daughter and—two daughters and family, you know." Finally, the man with the gun said, "Why does he keep on saying my name?"

The man with the gun (Gregory) asked Cline where his keys were. They found the keys and started to go to Cline's truck. At this point, Cline said, "Fuck this," and charged Gregory. Gregory fired at Cline, and Cline fell towards the gunman. The gunman shot twice more. McDonald was shot in the leg. Cline fell to the floor, and the intruders ran out.

Alexander, the roommate, was awakened by the gunshots. He saw three men run past the open door of his bedroom. Alexander came out of his bedroom and called 911.

Sometime between 6:00 and 7:00 in the morning, defendants arrived back at Reed's apartment, where Robison, Fernandez, Marsh, Reed, and others were. They stayed there about 20 minutes. While they were there, they were going in and out of the bathroom and using profanity. Gregory was saying "Everyone get the F away from me, don't touch me," and was very agitated, hyper, and upset. Mason kept looking out the front window. He was "white as a ghost." Both Gregory and Mason appeared stressed.

Robison asked Gregory what had happened because Mason "was freaking out." Gregory said that things had gone bad at Cline's, and that Cline got shot. Robison tried to help Gregory come up with a plan, and told Gregory to get out of town and to make sure he took everything he had brought with him to Reed's apartment. Gregory also told Fernandez that he shot Cline twice, the first time in the gut. Later, Fernandez heard Mason say they had either blasted or booted someone in the head.

Gregory called Harris's cell phone. Gregory was distraught and crying. Harris met Gregory at Harris's house. Gregory was carrying a black semi-automatic handgun. He was fidgety and appeared to be under the influence of methamphetamine.

4

Gregory told Harris that he thought Cline was dead. He said that Martin told him to shoot, and he shot Cline. Gregory told Harris that both he and Martin had been armed. He said he shot Cline in the chest and head.

Around 7:45 or 8:00 a.m., Reed found a cell phone outside her apartment. She took it back to her apartment, where it started ringing. Reed answered the phone in speaker mode. The person on the other end asked for Doug. Robison assumed it was Cline's cell phone, and started making motions with his hand across his throat telling her to cut off the call. Robison then wrote on a yellow pad, "Hang up, bad, got problems with my nephew[.]" Robison made her give him the telephone. Robison broke the phone and threw it in a dumpster.

The authorities, having spoken with McDonald and determined that Gregory was a likely suspect, went to Harris's address at approximately 9:00 a.m. They set up surveillance at the residence. As they watched, Fernandez and Gregory pulled up and parked in front of Harris's residence. Christine Shepherd, Harris's girlfriend, came out of the residence and got into the car. As the car left the house it lost traction and was hit by a pickup truck. An officer observed Gregory get out of the car and fumble with something at his waistband. He then stuck his hand into the pockets of his sweatshirt and held his hands tight against his waist. He walked back into Harris's house, was gone about a minute, then came back. When he returned, he was no longer clutching his waist, but had his hands down by his side. Gregory later told detectives that he put the gun under the sink under a garbage bag.

The gun was retrieved from the location given by Gregory. The gun was test fired, and the cartridge casings matched those recovered from the murder scene. The bullet recovered from Cline's body was also fired from the gun. A number of items were recovered from Fernandez's house, including Cline's wallet, containing his photo identification and three masks, as well as clothing consistent with that worn by Cline's attackers. DNA testing was performed on some of the items found. DNA consistent with Mason's was found on a white sleeve that had been torn off a shirt and fashioned into a mask. Another mask appeared to have been fashioned out of a black shirt and a white bandana. This mask contained DNA consistent with Gregory's DNA. The white bandana contained a blood stain that was consistent with Cline's DNA. Cline's blood was also found on a glove. Another pair of gloves contained DNA consistent with Martin's DNA.

People v. Martin, 2010 WL 2282095.

//////

///////

5

1  *AEDPA Standards*

2       The AEDPA legal standards play a significant role in this habeas case; thus, they are

3  explicated at some length.

4       The statutory limitations of federal courts' power to issue habeas corpus relief for persons

5  in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

6  Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

7
8         An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

9
10         (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

11
12         (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

13

14       As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

15  2254(d) does not require a state court to give reasons before its decision can be deemed to have

16  been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

17  Rather, "when a federal claim has been presented to a state court and the state court has denied

18  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

19  of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

20  v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when

21  it is unclear whether a decision appearing to rest on federal grounds was decided on another

22  basis).  "The presumption may be overcome when there is reason to think some other explanation

23  for the state court's decision is more likely."  Id. at 785.

24       The Supreme Court has set forth the operative standard for federal habeas review of state

25  court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable*

26  application of federal law is different from an *incorrect* application of federal law.'"  Harrington,

27  supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000).

28  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

6

1  'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786,

2  citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

3      Accordingly, "a habeas court must determine what arguments or theories supported or ...

4  could have supported[] the state court's decision; and then it must ask whether it is possible

5  fairminded jurists could disagree that those arguments or theories are inconsistent with the

6  holding in a prior decision of this Court."  Id.  "Evaluating whether a rule application was

7  unreasonable requires considering the rule's specificity.  The more general the rule, the more

8  leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.  Emphasizing the

9  stringency of this standard, which "stops short of imposing a complete bar of federal court

10  relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

11  cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

12  was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

13      The undersigned also finds that the same deference is paid to the factual determinations of

14  state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

15  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

16  decision that was based on an unreasonable determination of the facts in light of the evidence

17  presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

18  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

19  factual error must be so apparent that "fairminded jurists" examining the same record could not

20  abide by the state court factual determination.  A petitioner must show clearly and convincingly

21  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

22  969, 974 (2006).

23      The habeas corpus petitioner bears the burden of demonstrating the objectively

24  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

25  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

26  show that the state court's ruling on the claim being presented in federal court was so lacking in

27  justification that there was an error well understood and comprehended in existing law beyond

28  any possibility for fairminded disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  "Clearly

1    established" law is law that has been "squarely addressed" by the United States Supreme Court.

2    Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008).  Thus, extrapolations of

3    settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

4    Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006) (established law not permitting state

5    sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

6    prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

7    established law when spectators' conduct is the alleged cause of bias injection).  The established

8    Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

9    controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

10   federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

11         The state courts need not have cited to federal authority, or even have indicated awareness

12   of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S. Ct. at 365.

13   Where the state courts have not addressed the constitutional issue in dispute in any reasoned

14   opinion, the federal court will independently review the record in adjudication of that issue.

15   "Independent review of the record is not de novo review of the constitutional issue, but rather, the

16   only method by which we can determine whether a silent state court decision is objectively

17   unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

18         Finally, if the state courts have not adjudicated the merits of the federal issue, no

19   AEDPA deference is given; the issue is reviewed de novo under general principles of federal law.

20   Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).  However, when a state court decision on a

21   petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

22   habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

23   merits.  Johnson v. Williams, ___ U.S. ___, 133 S. Ct. 1088, 1091 (2013).

24         Ground One—Due Process/Confrontation Clause Error in the Admission of

25         Untrustworthy-in-Part, Out of Court Statements

26         The issue here involves the unusual situation where part of an out-of-court hearsay

27   statement of one of the co-defendants, placed before the jury and pertinent to petitioner's guilt,

28   was later conceded by the prosecution not to have been said; but that because other aspects of the

8

co-defendant's statement were corroborated, there was no constitutional problem in the admission of the *entire* out-of-court statement.  While the undersigned cannot completely adopt the reasoning of the appellate court in this regard, and the issue is not decided pursuant to AEDPA, the undersigned finds that a <u>Napue</u> error occurred but that the alleged error is harmless in light of all the factual circumstances.

The undersigned first sets forth the factual background of this issue as set forth by the Court of Appeal, but adds some focus on very significant factual circumstances.  Then, the undersigned separates out the extraneous issue of state hearsay law versus the federal issues in this case.  Next, the reasoning of the California appellate court is given followed by the undersigned's analysis.

> Gregory made a statement to Harris that was the subject of a motion in limine. The prosecutor argued that Gregory's statement to Harris that Martin told him to shoot Cline was a statement against penal interest, and was therefore an exception to the hearsay rule. The trial court ruled that the statement was admissible as a statement against penal interest, and was also admissible as a spontaneous declaration. The trial court found the statement was not testimonial in nature, and that it was made with sufficient indicia of trustworthiness to be admitted.

> At trial, Harris testified Gregory told him Cline was dead. Gregory said that Martin had told him to "Shoot, shoot." Harris told the officers who interviewed him that Gregory admitted to shooting Cline.

> Martin's attorney elicited from Harris that Gregory claimed Martin shot Cline in the chest, and that when Cline was being robbed he said, "I know it's you, Vince. I know who you are, Vince and Raymond. I know it's you. I know it's you. You're not robbing me."

> When the prosecutor discussed Gregory's statement to Harris during closing argument, he told the jury to be cautious of the statement of an accomplice, and that Gregory clearly was an accomplice. He reminded the jury that it could not use the statement of an accomplice to prove a fact unless there was corroborating evidence. He then argued:

/////

"Well, you gotta be careful with this, because we know from Anna McDonald that these things were not said. She was there. She's got no dog in this fight. She's got no spin as far as what it is these intruders are saying. And she does not say anything about anybody saying—or Doug Cline saying, 'It's you, Vince and Raymond.' None of this Raymond stuff came from Doug Cline. That is not true.

So the extent that you've got Vincent Gregory saying this to Travis Harris, he is not telling him something that's true. So he's not a reliable relater of events insofar as that's concerned.

We also know from her that there was no statement to the effect of, 'Shoot him,' by any other participant in this trial during the course of the shooting. The words said before the shots were, 'I will kill you,' or words to that effect by suspect number one. According to Anna McDonald, suspect number two is trying to get out of the way as Doug Cline is charging suspect number one. He's not saying anything.

In other words, Vincent Gregory's relation of what's going on in that to his dad, his street dad, is not accurate. But he is indicating during the course of that statement that he, that is to say, Vincent Gregory is shooting Douglas Cline. He's basically confessing a crime. And he's relating by implication who else is involved with him in it, Raymond Martin."

People v. Martin at *25-26.

There are a few more facts worth focusing upon. The prosecutor who argued the motion-in-limine (Schubert) was different from the prosecutor at trial who admitted in argument that the Martin statements were not made (Kindall), but it appears that both were heavily involved in pretrial preparation and the trial itself. The pre-trial prosecutor did not argue that any of the sought-to-be-admitted Gregory to Harris statement was unreliable. Rather, she argued strongly in writing and at hearing that the *entire* statement was trustworthy. See 2 RT 146-160, 167-172, CT 311. Defense counsel, at that time, was opposed to any of the statements coming in.

The trial prosecutor on redirect examination of Harris then introduced before the jury, without explanation or redaction, *only* the Gregory to Harris statement of the later repudiated fact that Martin had told Gregory to shoot. RT 1507. For whatever reason, as recounted by the Court

1    of Appeal, it was *Martin's counsel* who then brought out on cross-examination that the victim

2    (Cline) had verbalized his recognition that Martin was one of the assailants and that Martin had

3    participated in some of the shooting.[2] RT 1509.

4         The trial prosecutor first conceded at an instructional conference discussing the possibility

5    of aiding and abetting involuntary manslaughter that the Gregory to Harris statements were not

6    credible: "In addition, frankly, there's no evidence that anybody aided and abetted the shooter in

7    shooting….I mean the closest you get is Gregory's alleged version to Travis Harris that before he

8    committed the shooting, Raymond Martin [petitioner] was telling him to shoot, a statement

9    which, frankly, is not credible, given that Anna McDonald heard no such thing."  2 RT 2580-

10   2581.  The trial prosecutor than made the remarks at final argument set forth by the Court of

11   Appeal above—again essentially stating that Gregory made up the "Martin [petitioner] told me to

12   shoot," statement, the direct participation of Martin shooting, and the victim expressly referencing

13   *Martin*, as well as Vince Gregory,— in the victim's (Cline) statement: "why are you doing this."

14   RT 2642, 2669.

15        As it turned out, the trial prosecutor, Kindall, apparently, by use of the now untrustworthy

16   statements simply wanted to establish the unvarnished implication that Martin was at the victim's

17   residence.  That is, why would Gregory have implicated Martin at all, even in an exaggerated

18   way, if Martin had not been at the murder scene.  RT 2643.

19   /////

20

21   [2] The actions of Martin's counsel are somewhat puzzling.  If he had not brought out the Gregory
     assertion that Martin was a shooter, or that Martin was expressly recognized by the victim, Cline,
22   the jury would never have heard those facts.  In opening statement, prosecutor Schubert only
     mentioned the alleged direction by Martin to Gregory, i.e., the  "shoot him" statement. RT 425.
23   Defense counsel likewise in opening referenced only that part of the statement.  RT 439-440.  As
     recounted in the text, the prosecutor (Kindall) introduced only the one "shoot him" statement,
24   petitioner's counsel (Corbin) introduced the other two.  In final argument, after the prosecutor
     Kindall had repudiated the veracity of all three statements, defense counsel again referenced all
25   three statements pertinent to Martin, and merely related that McDonald had not heard them.
     Perhaps defense counsel, having lost the battle to keep any Gregory to Harris statement out of the
26   trial, by introducing two of the statements, was attempting to set up the argument to repudiate all
     of the alleged Gregory to Harris statements regarding his client, including any implication of
27   presence, by focusing on the unreliability of all the various statements.  However, the undersigned
     need make no final determination on this speculation here.
28

1    However, before analyzing whether introduction of the three statements amounted to

2    Bruton or Napue error, there remains the threshold issue that *petitioner*, through his counsel,

3    having introduced two of the three challenged statements, cannot be heard to claim now that the

4    introduction of such statements was due process or Napue error, or any kind of error.  While after

5    the ruling on the motion-in-limine, it may have appeared that the prosecution was going to

6    introduce all three statements, it turned out that they did not.  While defense counsel may have

7    then made a tactical decision to utilize all of the statements, once the prosecutor introduced one,

8    see footnote 1, the fact remains that the prosecutor did *not* introduce two of the Gregory to Harris

9    statements pertinent to petitioner.  There cannot be claimed error for "almost introducing"

10   untrustworthy evidence.  The undersigned will thus analyze the one "direction to shoot" statement

11   that was introduced by the prosecution.

12       The Court of Appeal analyzed the issue as follows:

13           The statement against interest exception to the hearsay rule permits
             admission of only the portions of a declarant's statement that are
14           "specifically disserving" to the declarant's interest. (People v. Leach
             (1975) 15 Cal.3d 419, 441.) Under this particular exception to the
15           hearsay rule, the trial court must redact any portion of a statement
             not specifically disserving to the declarant. (People v. Duarte
16           (2000) 24 Cal.4th 603, 612.)

17           However, a statement of one defendant that implicates another is
             admissible provided it satisfies the statutory definition of a
18           declaration against interest and satisfies the constitutional
             requirement of trustworthiness. (People v. Cervantes (2004) 118
19           Cal.App.4th 162, 176–177.) "'This necessarily requires a "fact-
             intensive inquiry, which would require careful examination of all
20           the circumstances surrounding the criminal activity involved; ..."
             [Citation.]'" (Ibid.)
21
             In this case, the statement that Martin told Gregory to shoot, and
22           that Gregory did shoot and kill Cline, was sufficiently against the
             penal interest of Gregory to satisfy the exception. Gregory's
23           statement that Martin told him to shoot was against Gregory's
             interest because it implicated Gregory as the shooter.
24
             There was also evidence of trustworthiness. As the prosecutor
25           argued at the hearing on the motion in limine, circumstances, as
             well as other testimony, corroborated Gregory's statement to Harris.
26           For example, Gregory told Harris they entered Cline's house
             through a sliding glass door, and this information was corroborated
27           by Gregory's confession to investigators. Gregory told Harris they
             were wearing masks during the incident, which was confirmed by
28           McDonald, and by the recovery of masks containing the DNA of

                                              12

two of the defendants. Gregory told Harris that Martin tied up the victim, which was confirmed by McDonald's statement that the person with the dark jacket and fur hood tied up Cline. Gregory told Harris that Cline kept calling his name, a fact corroborated by McDonald. Gregory told Harris Cline was shot in the head and chest, a fact corroborated by the autopsy. All of this was sufficient evidence to support the trial court's conclusion that the statement was trustworthy, even if McDonald did not remember hearing Martin tell Gregory to shoot Cline, and even if the prosecutor later argued the statement was not made.

The statement also qualified as an exception to the hearsay rule because it was a spontaneous declaration. Martin claims the statement did not qualify as a spontaneous declaration because Gregory spoke with Harris a few hours after the killing, and there was time for Gregory to "contrive and misrepresent." Martin also claims Gregory's statement was in fact contrived, as later admitted by the prosecutor in closing argument.

Whether Gregory's statement met the requirements of a spontaneous declaration presents a question of fact over which the trial court exercises its reasonable discretion. (People v. Smith (2007) 40 Cal.4th 483, 519.) We conclude the trial court did not abuse its discretion.

Evidence Code section 1240 provides:

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

Gregory's statement clearly satisfied the first requirement.

As to the second requirement, the passage of time does not deprive the statement of the required spontaneity if it was made under the stress of excitement while the reflective powers were in abeyance. (People v. Brown (2003) 31 Cal.4th 518, 541.) " 'The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is ... the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant.... [U]ltimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter.' [Citation.]" (Ibid.)

In this case, Harris testified that Gregory called him on the phone sometime between 6 a.m. and 9 a.m. on the morning of the shooting. The sheriff's department received the call dispatching

them to the scene at 6:11 a.m. Thus, Harris talked to Gregory between a few minutes to three hours after the shooting. Gregory was crying and sounded distraught. Harris saw Gregory 20 to 30 minutes later. Gregory was crying, would not stand still, was moving around and fidgety, and appeared to be under the influence of methamphetamine. This evidence sufficiently established that Gregory was speaking "under the stress of excitement and while the reflective powers were still in abeyance." (People v. Brown, supra, 31 Cal.4th at p. 541, italics omitted.)

There was no confrontation clause violation because Gregory's statement was not testimonial. Martin argues Bruton v. U.S. (1968) 391 U.S. 123 [20 L.Ed.2d 476], not Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177], determines whether the statement of a non-testifying co-defendant is admissible.

The Bruton rule bars the admission of one defendant's out-of-court statement that incriminates a codefendant. (Bruton, supra, 391 U.S. at pp. 135–136 [20 L.Ed.2d at p. 485].) The rule assumes that the statement is inadmissible hearsay against the codefendant. (People v. Smith (2006) 135 Cal.App.4th 914, 922.) "[I]f the statement is admissible against the codefendant under a hearsay exception, and its admission otherwise survives confrontation analysis, then the jury may consider it against the codefendant; no reason exists for severance or redaction." (Ibid .)

The confrontation clause of the Sixth Amendment is concerned solely with hearsay statements that are testimonial. (Davis v. Washington (2006) 547 U.S. 813, 821–825 [165 L.Ed.2d 224, 237–239].) "[I]t is the 'involvement of government officers in the production of testimonial evidence' that implicates confrontation clause concerns." (People v. Geier (2007) 41 Cal.4th 555, 605.) Gregory's statement to Harris was not a formal statement to a government officer, but an informal statement to a friend, thus was not testimonial and did not violate the confrontation clause. (People v. Jefferson (2008) 158 Cal.App.4th 830, 842.)

Because Gregory's statement was not inadmissible hearsay, and was not testimonial, it was admissible under both Bruton and Crawford.

Because we conclude the statement of Gregory was admissible under two exceptions to the hearsay rule, and did not violate the confrontation clause because it was not testimonial, the prosecutor did not commit misconduct in arguing for its admission.

People v. Martin, 2010 WL 2282095 at **26-27.

Firstly, there is no AEDPA issue before the undersigned concerning the correctness of the conclusion of the state appellate court that the hearsay was admissible hearsay under state law. To the extent that petitioner argues that the state court violated state evidentiary law by admitting the victim's prior statements, as related by Gregory, at trial, petitioner is advised that federal

14

1   habeas relief is not available for alleged error in the application of state law. <u>Wilson v. Corcoran</u>,

2   ___ U.S. ___, 131 S. Ct. 13 (2010). The decision of the California Court of Appeal rejecting this

3   state law claim is binding on this court and may not be challenged in this federal habeas corpus

4   proceeding. <u>Waddington v. Sarausad</u>, 555 U.S. 179, 192 n.5 (2009) ("we have repeatedly held

5   that 'it is not the province of a federal habeas court to reexamine state-court determinations on

6   state-law questions"); <u>Rivera v. Illinois</u>, 556 U.S. 148, 158 (2009) ("[A] mere error of state law ...

7   is not a denial of due process") (quoting <u>Engle v. Isaac</u>, 456 U.S. 107, 121, n. 21 (1982) and

8   <u>Estelle v. McGuire</u>, 502 U.S. 62, 67, 72-73 (1991)); <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005)

9   ("a state court's interpretation of state law . . . binds a federal court sitting in federal habeas");

10  <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990) (federal habeas corpus relief does not lie for errors of

11  state law); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991) ("[F]ailure to comply with

12  the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas

13  relief.").

14          Nor can petitioner claim that introduction of the one statement by the prosecutor was

15  unfair in some, generalized due process sense.

16              Moreover, a generalized notion of untrustworthiness of
            evidence as violating due process cannot be sustained in an AEDPA
17          context—at least not at present. The Supreme Court has made very
            few rulings regarding the admission of evidence as a violation of
18          due process. Although the Court has been clear that a writ should be
            issued when constitutional errors have rendered the trial
19          fundamentally unfair, <u>see</u> <u>Williams</u>, 529 U.S. at 375, 120 S.Ct.
            1495, it has not yet made a clear ruling that admission of irrelevant
20          or overtly prejudicial evidence constitutes a due process violation
            sufficient to warrant issuance of the writ. Absent such "clearly
21          established Federal law," we cannot conclude that the state court's
            ruling was an "unreasonable application." <u>Musladin</u>, 549 U.S. at 77,
22          127 S.Ct. 649.

23  <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009).

24          However, there are two specific claims recognized by the Supreme Court which are

25  applicable here: a <u>Bruton</u> claim and a <u>Napue</u> claim.[3] A <u>Bruton</u> claim prohibits the introduction of

26  _____

27          [3] Petitioner does not have a Confrontation Clause claim even though he was unable to
    cross-examine Gregory because he was able to cross-examine Harris, the one who testified to the
    statements made by Gregory, and in any event, as set forth in the text, Gregory's statement was

28  non-testimonial. Accordingly, the Confrontation Clause <i>per se</i> would seem to have no

1   a co-defendant's "testimonial" confession if unredacted statements within the co-defendant's

2   confession implicate another defendant at the same trial, and the statements are

3   inadmissible/untrustworthy.  Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620 (1968); see

4   Ocampo v. Vail, 649 F.3d 1098 (9th Cir. 2011) (discussing Bruton).

5          The state appellate court found that the statements, admissible under state law, were not

6   testimonial as Bruton does not apply to non-testimonial statements.  The undersigned finds that

7   the state appellate court's conclusion did not violate clearly established Supreme Court law.

8   Hundley v. Montgomery, 2014 WL 1839116 (E.D. Cal. 2014) (exhaustively discussing the issue);

9   see also Hayes v. Ayers, 632 F.3d 500, 513-514 (9th Cir. 2011); Smith v. Chavez,

10  __Fed.Appx.___, 2014 WL 1229918 (9th Cir. 2014).

11         In 2004, the United States Supreme Court held that the Confrontation Clause bars the state

12  from introducing into evidence out-of-court statements which are "testimonial" in nature unless

13  the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness,

14  regardless of whether such statements are deemed reliable.  Crawford v. Washington, 541 U.S.

15  36, 68 (2004).  This rule applies only to hearsay statements that are "testimonial" and does not bar

16  the admission of non-testimonial hearsay statements.  Id. at 42, 51, 68; see also Whorton v.

17  Bockting, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-

18  court nontestimonial statement.").  The statement made in this case by Gregory to Harris was not

19  testimonial.  See Doan v. Carter, 548 F.3d 449, 458 (6th Cir. 2008) (victim's statements to friends

20  and neighbors not testimonial under pre-Crawford standards); United States v. Manfre, 368 F.3d

21  832, 838 n.1 (8th Cir. 2004) (statements made by declarant to family members were not

22  "testimonial" because they were "not the kind of memorialized, judicial-process-created evidence

23  of which Crawford speaks"); Gonzales v. Clark, 2009 WL 3233906, *8 (C.D. Cal. Sept. 30, 2009)

24  (petitioner's private statements to his aunt were not testimonial in nature).  Thus again, the

25  conclusion of the California Court of appeal was not AEDPA unreasonable.

26  /////

27  _____

28  application here.

16

1    This brings the discussion to the Napue claim—the purposeful introduction of evidence

2    known to be false.  Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173 (1959).  The Court of

3    Appeal initially appeared to note the issue—"Martin also argues the prosecutor committed

4    misconduct in arguing for the admission of the statement," but thereafter failed to discuss it as a

5    Napue violation.  That court summarily dismissed any misconduct claim solely as an adjunct to

6    the Bruton issue.  People v. Martin, 2010 WL 2282095 at *28.  However, the misconduct issue

7    was cited to the Court of Appeal as a Napue issue.  See Petitioner's Opening Brief at 37 and

8    Reply Brief at 5-6.  We simply do not know why the Court of Appeal failed to recognize the

9    explicitly raised issue.  The Napue issue was cited and presented to the California Supreme Court

10   in the petition for review.  See Petition for Review at 6-7.

11   Despite the explicit presentation of the Napue issue, respondent does not believe the

12   claim to be exhausted because it was not presented to the state supreme court in a way in which

13   they could review it.  Respondent takes the novel position that although the issue was certainly

14   raised by petitioner—in the appellate and state supreme courts, a motion for reconsideration

15   should have been made to the Court of Appeal so that it could rectify its oversight, thus giving the

16   state supreme court a fair chance to review it.  However, exhaustion only requires that petitioner

17   give the state's highest court a "fair opportunity" to review the issue.  It does not make a

18   petitioner responsible for the mistakes of a lower court in failing to address an issue which he

19   explicitly raised.  This is not a Castille v. Peoples, 489 U.S. 346, 109 S. Ct. 1056 (1989), where

20   the state's highest court is presented an issue by petitioner *in a form* which it does not generally

21   review, *or at a time* when the issue is not properly reviewed.  Respondent cannot explain away

22   the common sense notion—that when an adjudicative body tasked with reviewing a case fails to

23   review a raised issue, exhaustion is complete.  This holds true whether or not the case involves a

24   habeas petition.  See B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1099 (9th Cir. 2002); Notash v.

25   Gonzales, 427 F.3d 693, 696 (9th Cir. 2005).  This is not a situation like Casey v. Moore, 386

26   F.3d 896 (9th Cir. 2004), where a habeas petitioner did not raise an issue in the lower courts, but

27   raised it for the first time obliquely and belatedly in a higher court petition.  The Napue violation

28   was only complete when the prosecutor finally conceded that the Gregory to Harris statements

1  regarding petitioner Martin were not trustworthy.

2  Turning to the merits, the undersigned first observes that because the state appellate and

3  supreme court did not reach the issue, no AEDPA deference is due.  Stanley v. Cullen, 633 F.3d

4  860.  The claim is reviewed de novo.

5  As earlier set forth, the prosecution initially touted the trustworthiness of the evidence to

6  the trial judge to allow its introduction, but when it appeared that it might be used to secure a jury

7  instruction which the prosecution thought harmful to its case, the inaccuracy of the evidence was

8  "corrected."  The only fair inference from the record is that the quick change in position indicates

9  that the prosecution all along knew the statements attributed to Gregory regarding petitioner

10  Martin had never been made.  It is highly improbable that the prosecution was "surprised" by the

11  McDonald testimony not attributing any statements by Martin on the scene or referencing

12  petitioner Martin, as any reasonably proficient prosecutor would have read the police reports

13  concerning the victim's McDonald's statements and/or interviewed the live victim before trial.

14  Moreover, nothing in the record indicates that the prosecutor was taken aback when McDonald

15  testified, i.e., nor surprise was exhibited nor were there made any clarifications to "new"

16  testimony which had just come out on the witness stand.  In sum, only when a tactical choice by

17  the prosecutor had to be made did the correction come out.

18  It is beyond cavil that a prosecutor may not knowingly inject false information into a trial.

19  Napue v. Illinois, 360 U.S. at 269, 79 S. Ct. 1173 (1959); Dow v. Virga, 729 F.3d 1041, 1043 (9th

20  Cir. 2013).  Even in situations where the prosecution is surprised by the introduction of false

21  evidence, a duty on the part of the prosecution arises to correct the information.  Id.  This duty

22  applies only to the prosecution—the defense does not have corresponding duty.  Sivah v.

23  Hardison, 658 F.3d 898 (9th Cir. 2011).  The issue here, however, involves somewhat of a hybrid:

24  the introduction of false evidence by the prosecution, known at the time of its introduction to be

25  false, but then later corrected by the prosecution, compounded by the defense introduction of

26  related, but equally false, evidence.

27  Generally when a prosecutor has injected false information into a trial, "reversal is

28  virtually automatic."  United States v. Rodriguez, __F.3d__, 2014 WL 2766197 (9th Cir. 2014).

The case law in the above circumstances, however, is unclear in respect to whether a prosecutor may deliberately inject false information into a trial, but escape any consequences because he has "corrected" the information if only at the last minute. See Dow v. Virga, 729 F.3d at 1042-1043 (finding a Napue violation where "[i]n the course of the trial, the prosecutor knowingly elicited and then failed to correct false testimony.").

In Phillips v. Ornoski, 673 F.3d 1168, 1181. n.7, the court noted:

> "Napue prohibits the government from knowingly using false evidence to obtain a criminal conviction, while Acorta and Pyle obligate the government to correct false evidence thus presented. See Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005 (en banc). For simplicity, we refer to the state's failure to fulfill its obligation not to present false evidence, and to correct it once presented, as a Napue violation."

Additionally, the court in Hayes v. Brown, stated:

> "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.' (citation omitted). In addition, the state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears." (citing Alcorta and Pyle)

399 F.3d at 978 (emphasis added).

The undersigned understands Hayes as creating "either/or" alternatives. The Supreme Court cases cited, although terse, appear to support this alternative analysis. See also United States v. Houston, 648 F.3d 806, 814 (9th Cir. 2011) ("The government's failure to correct testimony that it later learns is perjured is also a Mooney-Napue violation.") (emphasis added).

The undersigned believes the "either/or" alternative states the correct law. Unless trial is to be reduced to a game, where the accurate information is withheld until the last minute, or half-truths are dribbled in over the course of trial, the rule should prohibit the deliberate introduction of false evidence—period. Moreover, the undersigned cannot think it at all proper in deliberately deceiving the trial judge as to the trustworthiness of evidence during a motion-in-limine, even if the prosecution has determined that it may correct the deception at a later time.

Such was not done here. Whatever the reason for the vigorous pretrial argument to have the entire Gregory statement, including the specific statements to be introduced against Martin:

1    the hope that the incriminating-to-Martin statements would be the *coup de gras*; or even the

2    hidden intent to argue later that, while the substance of the statements were untrustworthy, the

3    statements nevertheless indicated Martin's presence, the prosecution committed misconduct in the

4    deliberate advocating for the introduction in their entirety of the non-explained statements with

5    the subsequent unadorned admission before the jury of the "shoot him" statement.  It is clear that

6    the prosecution did not trust the judge to admit the evidence with an upfront explanation of its

7    falsity and possible inferential use.   Furthermore, the "shoot him" evidence initially was

8    presented in an unexplained manner to the jury heightening the risk that later explanations would

9    be confusing at the very least.  Therefore, the undersigned finds that the prosecution committed a

10   potential Napue violation.  The final determinant of an actual Napue violation depends upon the

11   materiality of the one statement admitted by the prosecution.[4]

12        At first blush, the "virtually reversible per se" statement of various courts would seem to

13   mandate the finding of an actual violation.  This would be especially the case in the abstract

14   where the false statement directly implicated petitioner in the shooting.  Nevertheless, even those

15   courts which initially use such language, go on to apply a standard for materiality, which in this

16   case is not the well used Brecht[5] standard.  The undersigned finds that Dow v. Virga, 729 F.3d at

17   1048, provides the controlling law.

18
      Although the government's knowing use of false testimony does not automatically
19    require reversal, courts apply a less [FN4 omitted] demanding materiality standard
      to Napue errors: whether "there is any reasonable likelihood that the false
20    testimony could have affected the judgment of the jury." United States v. Agurs,
      427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (emphasis added). This
21    materiality standard is, in effect, a form of harmless error review, but a far lesser
22    showing of harm is required under Napue's materiality standard than under
      ordinary harmless error review. See Smith v. Phillips, 455 U.S. 209, 220 n. 10, 102
23

24  _____

25  [4] Unlike the Court of Appeal's Bruton or evidentiary analysis, the focus for the Napue error is the
    prosecution's deception, *not* whether *in the absence of that deception* there existed sufficient
26  corroborating evidence before the trial judge at the motion-in-limine to deem the Gregory
    statements trustworthy.  We all know at this point-- that regardless of the dressing up of the
27  statements with other evidence which, in the absence of deception, would have made them
    trustworthy, the Gregory statements were ultimately and belatedly conceded to be untrustworthy.
28  [5] Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 113 (1993).

1  S.Ct. 940, 71 L.Ed.2d 78 (1982) (describing the "materiality requirement" that
2  applies to Napue and Giglio claims); see also Hayes v. Brown, 399 F.3d 972, 984
3  (9th Cir.2005) (en banc). Napue requires us to determine only whether the error
   could have affected the judgment of the jury, whereas ordinary harmless error
4  review requires us to determine whether the error would have done so.

5

6       In the circumstances of this case, the undersigned finds that the Napue violation was not

7  material, i.e., "whether there is any reasonable likelihood the false testimony *could* have affected

8  the judgment of the jury."  First, as observed above, the defense voluntarily introduced two of the

9  statements which the prosecution had ultimately determined not to elicit.  It is difficult to say that

10  the prosecution's elicited statement beforehand made much extra difference after the defense

11  contribution.  That is, the effect of the "shoot him" statement *itself* was greatly melded into the

12  other false statements introduced by the defense.

13       Secondly, and importantly, despite the fact that the prosecution's belated falsity

14  concession constitutes a Napue error, the prosecution did explicitly inform the jury during final

15  argument that all the statements directly implicating Martin in the shooting were not to be trusted,

16  and that, in fact, they were not made.  Although the prosecutor went on to argue the inferential

17  aspects of the statements—even though the statements regarding the shooting were false, they

18  demonstrated that Martin was there—there was nothing essentially wrong with the argued

19  inference itself.  The undersigned finds that the jury may have suffered confusion from the

20  turnabout, but ultimately not a material deception.

21       Next, petitioner's murder conviction under the felony murder rule did not depend upon his

22  direct involvement in the shooting itself.  So long as he was actively involved in the underlying

23  robbery/burglary, he did not need to use a gun on the victim, along with Gregory, or direct

24  Gregory to shoot, in order to be convicted of first degree felony murder with special

25  circumstances.  See e.g., People v. Chism, 58 Cal. 4th 1266, 1332, 171 Cal. Rptr. 3d 347 (2014).

26  Thus, all of the Gregory false statements about petitioner's direct involvement in the shooting

27  were much less material than they could have been had direct involvement in the shooting been

28

1    required.

2         Finally, as set forth in various parts of the Court of Appeal opinion, there was substantial

3    evidence, other than the false Gregory statements, which showed petitioner's presence and

4    participation in the underlying burglary/robbery. Davison, petitioner's girlfriend, placed petitioner

5    in the car with the other robbery/burglary participants just before those events took place.

6    Petitioner had transferred materials, ostensibly to be used in the burglary/robbery, from the car he

7    had been riding in with Davison, to the car of Mason and Gregory.  Gloves which apparently had

8    been used in the burglary/robbery had petitioner Martin's DNA on them.  McDonald's

9    description of petitioner and his distinctive clothing in Cline's/McDonald's room, while bearing

10   minor discrepancies, essentially matched what other witnesses had related about Martin's

11   clothing.  Post murder get-togethers provided additional evidence of Martin's involvement.

12   Finally, the prosecutor was able to argue Martin's consciousness of guilt based on his statements

13   to the police after arrest.[6]

14        In sum, the prosecution's end of arguing a reasonably fair inference from concededly false

15   statements does not justify the means of initially arguing the truthfulness of the false statements—

16   at least without informing the trial judge of what the prosecution was attempting.  However, the

17   misconduct must have had a potentially adverse effect on the outcome of the trial—it did not.

18        <u>Ground Two—Tainting A Witness By Telling Her that Petitioner Had Threatened Her</u>

19        <u>Life</u>

20        Petitioner argues that it is possible that a police officer corruptly related to Davison,

21   petitioner's girlfriend, and who was in protective custody at the time, that petitioner had

22   threatened her life.  The California Court of Appeal found that petitioner had forfeited this

23   argument by failing to raise it in the trial court, and that there was no evidence that the threat was

24   not real, or that the police told her of the threat to influence her testimony.  Specifically,

25   /////

26   ───────────────

[6] More will be said about these statements in a later section.  Suffice it to say here that while
27   petitioner made no direct admissions, the prosecutor argued for 12 pages of transcript, both on
     initial argument and rebuttal that Martin's evasiveness and inconsistencies with his basic mantra
28   of "I don't remember," showed a consciousness of guilt.

The factual support for Martin's claim comes from his own in limine motion to compel the disclosure of a confidential informant. The motion stated in pertinent part:

"Det. Frank Cioli, Sacramento County Sheriff Department (SSD) badge number 2313, reported on April 17, 2006, that he had received information from a confidential informant that Raymond Martin stated that he was going to get the witness, Danielle Davidson [sic], 'out of the picture.' (D 3115.) Det. Cioli told Det. R. Kolb, SSD 260, and she in turn contacted Danielle Davidson [sic] and informed her of the threat. (D 3113–3114.)"

Based on this information, Martin argued the identity of the confidential informant should be disclosed. In making this argument, Martin also claimed that the prosecution should be forced to disclose the informant's identity because if there were no confidential informant, then law enforcement would have "poison[ed] the well[.]" Martin now claims law enforcement intentionally biased Davison's testimony against him when it informed her of his threat, resulting in a denial of the right to a fair trial and due process.

People v. Martin, 2010 WL 2282095 at *29.

If viable, the Court of Appeal "forfeiture" ruling means that it had an independent state law reason for denying the claim, and hence petitioner has procedurally defaulted the claim in federal habeas.

A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " Kindler, 558 558 U.S., at ——, 130 S.Ct, at 615 (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. See Sykes, 433 U.S., at 81–82, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594.

* * *

To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." Kindler, 558 558 U.S., at ——, 130 S.Ct., at 618 (internal quotation marks omitted).FN4 [omitted] "[A] discretionary state procedural rule," we held in Kindler, "can serve as an adequate ground to bar federal habeas review." Ibid. A "rule can be firmly established' and regularly followed,' " Kindler observed, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Ibid. California's time rule, although discretionary, meets the "firmly established" criterion, as Kindler comprehended that requirement.

Walker v. Martin, —— U.S. ——, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011)

23

1    (abrogating Townsend v. Knowles, 562 F.3d 1200 (9th Cir. 2009)).

2         The only procedural bar[7] that need be discussed here is the relatively common bar of

3    waiver or forfeiture of an issue by failing to raise it timely in a lower court.[8]  In addition to the

4    substantive law regarding procedural default, the Ninth Circuit has constructed a procedural

5    process for invocation of the bar.  First, a respondent must expressly invoke the bar.  Second, a

6    petitioner must articulate specific reasons why he believes the bar to be invalid under federal

7    procedural default law.  An exception to this specific articulation is the situation where the Ninth

8    Circuit has previously held the bar to be inadequate, or not clearly established/regularly followed;

9    in this situation all a petitioner need do is object to the invocation of the bar.  If petitioner meets

10   his burden, respondent then has the ultimate burden of proving the legitimacy of the bar.  See

11   Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003); King v. Lamarque, 464 F.3d 963, 967–68 (9th

12   Cir. 2006).  Finally, a defaulted petitioner may overcome the bar with a showing of cause and

13   prejudice.

14        In this case, petitioner's counsel made a motion to disclose a confidential informant.  The

15   primary thrust of the motion was that the defense needed to query the confidential informant who

16   instigated the "threat" contact by law enforcement of the witness, a communication conceded

17   below.  The defense speculated that perhaps the informant would deny the statement made to law

18   enforcement which could lead to a finding by the trier of fact of an improper bias, i.e., a tainting

19   of the witness with the threat information.  CT 275-276.  The prosecution, although conceding the

20   communication, responded that there was no need to expose the confidential informant in that

_____

[7] The undersigned refers to procedural default and procedural bar interchangeably.

[8] See e.g., Carrera v. Ayers, 699 F.3d 1104, 1109 (9th Cir. 2012): "His counsel's failure to make a Wheeler objection at trial was a procedural default under state law that prevented him from making a Wheeler challenge on appeal. See Carrera, 49 Cal.3d at 331 n. 29, 261 Cal.Rptr. 348, 777 P.2d 121 (Cal.1989) (noting "[t]he requirement that a contemporaneous motion be made to object to a prosecutor's use of peremptory challenges to exclude prospective jurors of one racial group"); Wheeler, 22 Cal.3d at 284 n. 32, 148 Cal.Rptr. 890, 583 P.2d 748 ("[P]eremptories [were] not 'open to examination' unless and until on a timely motion the trial court is satisfied there is a prima facie showing that jurors are being challenged on the sole ground of group bias.").

1   exposure of the informant was only necessary if the informant had information pertinent to

2   innocence of the accused.  CT 311-313.  Such was not the case here where the motion was to seek

3   witness impeaching information only.  Petitioner did not respond in writing.

4        At hearing, petitioner's co-defendant's counsel argued that the information was pertinent

5   to a potential <u>Giglio</u> (impeaching evidence) claim.  Petitioner indicated that he agreed with the

6   <u>Giglio</u> argument.  RT 60-65.  The prosecution responded that it was not even going to call the

7   informant witness, RT 65, although it appeared that claim was directed at impeaching witness

8   Davison to show her potential bias.  [However, as the law enforcement contact was conceded,

9   there was no need to expose the informant]. Petitioner, along with the others, argued that an *in*

10  *camera* hearing was necessary to ferret out the correct information.  Petitioner's counsel did

11  argue, as a tagline to the main argument, that perhaps the confidential informant did not exist.  In

12  that situation: "Then it would be critical.  And my cross-examination of these two officers about

13  poisoning the well with Danielle Davison—by poisoning the well I mean by setting up something

14  that doesn't exist—that's a possibility, and that certainly needs to be fleshed out in camera at

15  least."  RT 69.

16       Before the Court of Appeal, petitioner had changed his argument.  The primary issue now

17  was that the police, by communicating the specific threat, had implanted a bias in this important

18  witness.  Petitioner's Opening Brief at 45-48.  A subsidiary issue based on state law, the failure to

19  hold an *in camera* hearing, was also raised.  Petitioner raises the same witness taint issue in his

20  present petition.

21       The Court of Appeal may have been correct that the "witness taint" *per se* issue had not

22  been raised before the trial court, and hence was forfeited.  However, respondent, aside from

23  quoting the totality of the Court of Appeal opinion on this issue raises no issue of procedural

24  default.  Rather, respondent relies on an argument that petitioner has not raised any issue besides

25  state law issues which are not cognizable in habeas corpus.  Respondent has not met his <u>Bennett</u>

26  <u>v. Mueller</u> burden of specifically raising the procedural bar, if indeed, Respondent intended to

27  raise the defense at all.

28  /////

While the undersigned agrees that the asserted failure to hold an *in camera* hearing was, and presently is, based solely on state law, the primary issue is a melding of state *and* federal law. In the brief before the Court of Appeal, and in the present petition, both state and federal cases were cited on the issue of witness taint. Two Supreme Court cases were cited: Perry v. Leeke, 488 U.S. 272, 281 (1989) (coaching of a witness by the prosecution is unethical); Foster v. California, 394 U.S. 440, 42 (1969) (use of suggestive identification techniques by the police is improper). Two federal circuit level cases were also cited. The due process issue raised by petitioner, citing the Fourteenth Amendment, is not a state law issue.

The court further finds that if a police officer, *with primary intent to bias a witness*, relates to that witness that a defendant has promised "to take her out of the picture," such a revelation would constitute a due process violation—utilizing clearly established Supreme Court authority. Sheppard v. Maxwell, 384 U.S. 333, 86 S. Ct. 1507, 16 L.Ed.2d 600 (1966), goes far towards establishing this fact:

> Due process requires that the accused receive a trial by an impartial jury free from outside influences .... The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutor, counsel for defense, the accused, witnesses, court staff nor the enforcement officers coming under the jurisdiction of the court, should be permitted to frustrate its function.

Id. at 362, 86 S. Ct., at 1522.

The above holding is fairly elementary, and would certainly apply to an unwarranted attempt by the police to bias a witness against a defendant. See Jackson v. Brown, 513 F.3d 1057, 1072 (9th Cir. 2008) (prosecution responsible for the Giglio violations committed by police). Moreover, if it is a federal crime to corruptly attempt to influence a witness, 18 U.S. C. section 1512(a)(3)(b), it would strain credulity to find that nevertheless, it is not a due process violation when undertaken by the prosecution. The undersigned need go no further than his own habeas case of Stanley v. Wong, 2006 WL 1523128 (E.D. Cal. 2006) where the undersigned found a witness tampering violation when a habeas attorney unduly pressured a juror/witness into recanting a declaration which she had signed for the habeas petitioner. See also United States v. Vavages, 151 F.3d 1185, 1188 (9th Cir. 1998) (actions which would intimidate a witness from

1  testifying are a due process violation.

2      Nevertheless, petitioner could not logically argue that the transmission of the threat to

3  witness Davison *per se*, and without intent to taint, was inappropriate.  Assuming that there

4  actually had been a threat to the witness, the police would have been entirely remiss if they had

5  just ignored the threat, i.e., the witness is on her own.  Nor would a sanitization of the threat by

6  omitting the author have been of any use.  Such an ambiguous relation of the threat could well

7  prejudice *every* defendant as the witness is left to wonder from what corner the bullets will fly,

8  and of course, those defendants who did not issue any threat are unduly tarred.  Petitioner thus

9  requests an evidentiary hearing to ferret out the intent of the officers who heard and then related

10  the alleged death threat by petitioner to witness Davison. Two problems exist with this request:

11  (1) petitioner's supposition that the police invented the confidential informant, or invented what

12  he/she said about petitioner, is entirely speculative; and, (2) in the context of this case, the

13  reliability of the proceedings were not substantially affected even if petitioner's speculation is

14  accepted as a presumed fact.

15      Petitioner argued his due process witness taint argument in the Court of Appeal on direct

16  review.  However, there was no factual record in the trial court of the circumstances save for the

17  conceded fact that witness Davison was told of the threat.  Petitioner asked for discovery (a

18  different issue than presented here) in the trial court to understand all the circumstances but

19  because petitioner presented no facts underlying the potential *improper* police motivation, only

20  the speculative possibility of such, the discovery was denied.  Petitioner presents nothing further

21  herein with his claim that the improper motivation actually existed.

22      Since <u>Cullen v. Pinholster</u>, __U.S.__, 131 S. Ct. 1388 (2011), evidentiary hearings are not

23  granted unless it can be determined from the existing record that the California courts acted

24  AEDPA unreasonably in arriving at the determination on a legal or mixed fact/legal issue which

25  they did.  <u>See</u> <u>Pizzuto v. Blades</u>, 729 F.3d 1211, 1224 n.5 (9th Cir. 2013); <u>Miles v. Ryan</u>, 713

26  F.3d 477, 487 n.12 (9th Cir. 2013); <u>Stokley v. Ryan</u>, 659 F.3d 802, 807-808 (9th Cir. 2011).  The

27  California Court of Appeal determined in an alternative holding on the merits that the witness

28  taint issue was not actionable based on its speculative factual basis.  This finding was not

1   unreasonable.

2       Moreover, the witness involved here, Davison, was *already* in witness protection due to

3   the gang nature of the underlying crimes.  RT 20-21, 70-72, 321. A witness is in witness

4   protection because a determination has been made that the safety of the witness requires it.  And,

5   that safety concern, of course, has to do with the potential for retaliation by the defendants in a

6   criminal action, or by their confederates.  The undersigned cannot find that relating a specific

7   threat to a witness in such protective custody adds that much to the initial, slightly less focused

8   fears or potential for biased testimony.[9]

9       For the above reasons, the witness taint issue should be denied.

10      <u>Ground Three—Petitioner's Post-Arrest Statements to the Police Were Involuntary</u>

11      Usually, such an issue as headlined above is accompanied by dramatic admissions of guilt

12  by a defendant which torpedo any hopes of a defense.  However, in what might be an antithesis of

13  being unable to resist the police, petitioner held them at bay during the questioning refusing to

14  make any direct admissions.  When asked direct questions about the events of the night/morning

15  in question, petitioner proffered his lack of recollection because he was asleep/incoherent on

16  account of drug usage.  Sporadically, however, petitioner would remember specifics when they

17  might be perceived helpful to petitioner. Although useful in an indirect sense, the prosecution was

18  reduced to arguing that inconsistencies in petitioner's on again-off again memory showed a

19  consciousness of guilt.

20      There is no doubt that petitioner was coming down from a methamphetamine high when

21  arrested and interrogated by the police.  This fact was unequivocally established at a fairly

22  lengthy evidentiary hearing held by the trial court for petitioner's motion to suppress.  RT 213-

23  302.  However, petitioner believes his experts demonstrated an actionable impairment from

24  methamphetamine withdrawal, i.e., a crash, which rendered his entire interview involuntary

25  because of petitioner's methamphetamine induced extreme fatigue.  Petitioner's main focus is on

26

---

27  [9] Witness Davison and petitioner had been girlfriend/boyfriend at the time of the criminal actions,
    such as that status may be understood in the fairly, morally loose gang culture.  It is only logical

28  that the initial protective custody fears, warranted or not, had something to do with petitioner.

1    the argued lack of consideration by the trial court of opinions from petitioner's primary expert,

2    Dr. Heard, based upon the sustaining of objections to his opinion testimony.  Dr. Heard's report

3    conclusion was affirmed by him at hearing as follows:

> The second sentence on page 2, given the totality of the evidence reviewed by me, it appears that his will to resist questioning and to comprehend his options in response to advisements and subsequent questioning of the sheriff's department was impaired at the time of the first interrogation.
>
> A.  Correct"[10]

8    RT 254.

9         The prosecutor's relevance objection was sustained.  However, the witness had also

10   earlier and later explained:

> When you get significant sleep deprivation, it's like pouring sludge into the brain process.  One of the sign's consistent with—*I'm not saying it's really what was going on or not*—when you see these long pauses, when he can't really decide what it is he's going to do. *On the one hand, it could be just game playing.*  On the other hand, it could be he's trying to take into consideration a number of factors in a relatively complex mental operation, and he just hasn't got the speed to do it.

15   RT 253 (emphasis added)                              ***

> What you're telling us, when you're looking at this interview, his memory problems could be associated with methamphetamine, they could be associated with him just feigning memory problems. Right?
>
> A.  I already answered that yes.

20   RT 261.

> Well, did you ever consider the fact that maybe he just didn't want to recall?
>
> A.  Counsel, I've said yes to that several times now.

23   RT 266.

24        The trial judge on defense motion did accept Dr. Heard's entire report into evidence and

25   overruled the prosecutor's objection.

27   [10] An objection to a previous question asking Dr. Heard if petitioner's <u>Miranda</u> waiver was "knowing an intelligent," was also sustained, but this objection appears to have been based on the fact that the expert was asked a legal question to be decided by the court. RT 249.

The Court of Appeal ruled:

> Martin's attorney referred to Heard's report, stating, "Now, you've made an opinion in here. What's your opinion of whether or not he knowingly, intelligently waived his Miranda rights?" The prosecutor's objection to this question was sustained. Martin's attorney then read a portion of Heard's report, quoting, "given the totality of the evidence reviewed by me, it appears that his will to resist questioning and to comprehend his options in response to the advisements and subsequent questioning of the sheriff's department was impaired at the time of the first interrogation." Heard replied, "Correct." The prosecutor objected on relevance grounds and moved to strike. The trial court sustained the objection and granted the motion to strike. However, the trial court later allowed Heard's written report into evidence over the prosecutor's objection.

> Martin now claims the trial court erroneously excluded Heard's opinion that Martin did not knowingly and intelligently waive his Miranda rights. This argument is misguided, since the trial court admitted Heard's entire report, which Martin's attorney indicated contained his opinions regarding Martin's ability to comprehend and knowingly and intelligently waive his Miranda rights.

> Martin argues the trial court erroneously used Martin's conduct during the interrogation as the controlling criterion in deciding if the waiver was valid. There is no evidence to support this. The trial court indicated it reviewed the transcript as well as the videotape of the interview, and read the pertinent case law. As previously indicated, the court listened to the testimony of Heard, as well as the testimony of Jeffery Zehnder, a forensic toxicologist. The trial court admitted Heard's report into evidence.

> The proper standard for the trial court to determine whether a defendant has waived Miranda rights is whether the waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation. (People v. Hawthorne (2009) 46 Cal.4th 67, 86.) The trial court properly considered the totality of the circumstances. It did not err in admitting Martin's statement.

People v. Martin, 2010 WL 2282095 at **30-31.

The standards for determining whether a confession is voluntary, including comprehension of one's Miranda rights has been well established by Supreme Court authority:

> In determining the voluntariness of a confession, a court "examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (citation and internal quotation marks omitted). "The due process test takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." Id. (citations and internal quotation marks omitted). It is not sufficient for a court to consider the

30

1

2

3

4

5

6

7

8

9

10

11

12

> circumstances in isolation. Instead, "all the circumstances attendant upon the confession must be taken into account." Reck v. Pate, 367 U.S. 433, 440, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (citations omitted).
>
> The Supreme Court has observed that, "[t]he application of these principles involves close scrutiny of the facts of individual cases." Gallegos v. Colorado, 370 U.S. 49, 52, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) (emphasis added). "The length of the questioning, the use of fear to break a suspect, [and] the youth of the accused are illustrative of the circumstances on which cases of this kind turn." Id. (citations omitted). An additional relevant factor is "the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." Withrow, 507 U.S. at 693–94, 113 S.Ct. 1745(citations omitted). Thus, we ask: "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." Schneckloth v. Bustamonte, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (citation omitted).

13  Doody v. Ryan, 649 F.3d 986, 1008 (9th Cir. 2011) (en banc).

14        And, a reduced mental capacity is a factor, and sometimes a critical factor, in assessing

15  the voluntariness of a confession.  United States v. Preston, __F.3d__, 2014 WL 1876269 (9th

16  Cir. 2014).

17        However, the court does not review this issue *de novo* since the state courts made a

18  determination on the merits.  Rather the AEDPA deference previously described directs the

19  decision.  Based on a review of the totality of circumstances, one cannot say that reasonable

20  jurists could not have arrived at the conclusion that the interview statements (*denying*

21  participation in the crime), including the determination to waive Miranda rights was voluntary,

22  knowing, and intelligent.  The trial court held a hearing wherein the facts were fully aired.  While

23  the acceptance of Dr. Heard's opinions into evidence for consideration was ambiguous to say the

24  least, even this expert could not rule out the equally viable possibility that petitioner had made a

25  conscious decision to feign ignorance or memory problems.  Making such a conscious decision to

26  obstruct the interview is the polar opposite of having a mental condition so severe that one's will

27  is overborne by police questioning.  Moreover, while one could logically argue that a person who

28  is crashing will have his mental abilities "impaired," it is the degree of impairment that is of

31

1   importance.  The trial court judge stated that she had reviewed "everything," and found that the

2   impairment was insufficient.  Moreover, petitioner does not argue that there were any other

3   factors, e.g., improper or coercive questioning, food deprivation, threats, age which would have

4   played a role in the voluntariness equation.  The sum total of petitioner's argument was that he

5   was so impaired he could not be reasonably expected to have resisted the police questioning or

6   make an intelligent decision to waive Miranda rights.  The record disputes this argument, and in

7   any event, a state court determination that the record disputes the argument could not be

8   considered AEDPA unreasonable.

9          Ground Four- Equal Protection Violation in Not Instructing the Jury with Voluntary

10         Manslaughter

11        This is a curious claim in that petitioner's headlined issue differs from that due process

12  issue which is usually raised – the failure to give a lesser included offense jury instruction

13  violated due process.  See Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382 (1980). Petitioner's

14  trial counsel was upset that the shooter—Vincent Gregory, received an involuntary manslaughter

15  instruction, but petitioner Martin, who was conceded not to be the shooter did not receive such an

16  instruction upon request.  This issue was framed and briefed for the most part before the Court of

17  Appeal as a denial of equal protection.  One subsection did argue that he was entitled to have the

18  instruction given to the jury.[11]

19        Respondent argues that the Court of Appeal found no Equal Protection violation in that it

20  found there was no need to give the instruction.  However, the Court of Appeal apparently

21  assumed petitioner's argument that an equal protection error was made, and then discussed

22  whether the error was harmful.

23                In a supplemental brief, Martin argues the jury should have been

24               given an involuntary manslaughter instruction, and that the failure
                 to do so was a violation of his right to equal protection. We

25               conclude any error was necessarily harmless.

---

[11] However, in a non-capital case, unless the failure to instruct on a lesser offense disregarded a

26  defendant's theory of the case, no federal due process claim exists.  See Solis v. Garcia, 219 F.3d

27  922, 929 (9th Cir. 2000). Here, petitioner's theory of the case is that "he was not there" when the
    crimes were committed, not that he killed in imperfect self-defense.  He would be unable to state

28  a due process failure to instruct claim in the context of this case.

> The jury found true the special circumstance that the murder of Cline was committed by Martin while Martin was engaged in the commission of the crimes of burglary and robbery, within the meaning of section 190.2, subdivision (a)(17). Any error was necessarily harmless in light of these findings, since the killing was necessarily first degree felony murder, and no finding of a lesser offense was possible. (People v. Price (1991) 1 Cal.4th 324, 464.)

People v. Martin, 2010 WL 2282095 at *31.

Rather than attempt to ascertain for an AEDPA analysis whether the Supreme Court has ever found such an error to be actionable, i.e., the failure to give one defendant the same beneficial jury instructions that another similarly situated defendant received, and neither petitioner nor respondent aid the court in that inquiry, the undersigned will analyze whether the error was indeed harmless as found by the Court of Appeal.

In federal habeas, the failure to give a required instruction leading to a constitutional violation is not structural error:

> A constitutional error is harmless when "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder, supra, at 15, 119 S.Ct. 1827 (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); see also Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). We may not grant respondent's habeas petition, however, if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the Ohio Court of Appeals applied harmless-error review in an "objectively unreasonable" manner. Lockyer v. Andrade, 538 U.S. 63, 75–77, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); see also Woodford v. Visciotti, 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam); Williams, supra, at 410, 120 S.Ct. 1495 (An " unreasonable application of federal law is different from an incorrect application of federal law").

Mitchell v. Esparza, 540 U.S. 12, 17-18, 124 S. Ct. 7 (2003).[12]

The analysis of the Court of Appeal cannot be faulted, much less found unreasonable. Petitioner's defense here was not some stretched theory that no burglary took place because the entry was made to only undertake a misdemeanor, or that no

---

[12] It does not appear that the Supreme Court uses the Brecht substantial harm standard when a jury instruction constitutional error has been found, and the harmful error analysis of the state court is at issue.  Cf  Cavitt v. Cullen, 728 F.3d 1000 (9th Cir. 2013); Doe v. Busby, 661 F.3d 1001 (th Cir. 2011); Leon v. Felker, 506 Fed. Appx. 523 (9th Cir. 2013).

1   robbery took place because the culprits believed they were only taking back their own

2   property; the defense was that petitioner was never at the scene of the crime.  The jury

3   surely would have found that a burglary and robbery took place based on the facts of this

4   case whether or not an involuntary manslaughter instruction had been given.  Although

5   petitioner and Gregory had different juries, the fact that Gregory was convicted of felony

6   murder, even with the involuntary manslaughter instruction at issue, goes a long way in

7   assessing that the same result would have obtained in petitioner's case with petitioner's

8   jury.  There were simply no facts to distinguish the two defendants in terms of whether a

9   burglary/robbery took place.  And as the Court of Appeal opined, petitioner's jury did in

10   fact, find petitioner guilty of the same crimes on the overwhelming evidence that the

11   victim's death during an intended burglary/robbery.

12        This claim should be denied.

13   _Conclusion_

14        IT IS HEREBY RECOMMENDED that although Napue error was found, that error did

15   not substantially affect the verdict in petitioner's case.  All other claimed errors fail as well.  The

16   habeas petition should be denied.  A Certificate of Appeal (COA) should be issued for the Napue

17   claim discussed herein.

18        These findings and recommendations are submitted to the United States District Judge

19   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

20   after being served with these findings and recommendations, any party may file written

21   objections with the court and serve a copy on all parties.  Such a document should be captioned

22   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23   shall be served and filed within fourteen days after service of the objections.  Failure to file

24   objections within the specified time may waive the right to appeal the District Court's order.

25   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

26   Dated: 07/03/14

27                          /s/ Gregory G. Hollows

28                     UNITED STATES MAGISTRATE JUDGE